FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 JUN 24 A 7: 50

LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**VERNON TAYLOR**                                    **CIVIL ACTION**

**VERSUS**                                           **NO. 04-1760**

**JO ANNE B. BARNHART,**                             **SECTION "F" (3)**
**COMMISSIONER, SOCIAL**
**SECURITY ADMINISTRATION**

### REPORT AND RECOMMENDATION

Claimant/plaintiff, Vernon Taylor ("Taylor"), currently forty-five years of age, was found

disabled under Title II of the Social Security Act effective December 6, 1983 on the basis of

Schizophrenic Disorder (Paranoid Type), which then prevented all work.[1]  Thereafter, following

more than a decade of no psychiatric treatment for that condition,  review of the claimant's file,

numerous psychiatric and medical examinations, and two administrative hearings,[2] it was

determined that the plaintiff's medical condition had improved.  Based on "medical

improvement" related to the ability to work, claimant's disability ceased on October 1, 2000,

resulting in the termination of benefits on the aforesaid date.[3]

---

[1]*See* Disability Determination and Transmittal dated April 16, 1984 (noting the onset date
of December 6, 1983  for claimant's Schizophrenic Disorder, paranoid type) [Adm. Rec. 118-
119].

[2]*See* Transcript of Oral Hearing  dated April 24, 2002 [Adm. Rec. 558-587]; Transcript of
Oral Hearing dated January 1, 2004 [Adm. Rec. 588-609].

[3]*See* Decision of ALJ Charles W. Kunderer dated April 19, 2004 [Adm. Rec. 335-366].

1



Plaintiff seeks judicial review of the Commissioner's decision and this Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  The parties' cross motions for summary judgment

have been submitted for determination.  Having reviewed the written submissions, the

administrative record and the applicable law, the undersigned Magistrate Judge finds that there is

substantial evidence in the record supporting the decision of the Commissioner terminating

Taylor's benefits and thus RECOMMENDS dismissal of the plaintiff's case for the following

reasons.

## I. BACKGROUND

### A. Procedural History

On June 25, 2002,  ALJ Daniel Dadabo issued a decision determining that the claimant

was no longer eligible for benefits under the Act.  After consideration of the entire record, ALJ

Dadabo found that, since the April 16, 1984 comparison point decision (Adm. Rec. 118-119),

plaintiff experienced "medical improvement" related to his ability to work.[4]  At the comparison

point, the plaintiff had been diagnosed with Schizophrenic Disorder or Reaction (paranoid type)

and was hospitalized for that condition approximately two weeks in December of 1983. The

plaintiff's mental impairment then met the requisite criteria for Listing 12.03A 4,7 and B.[5]

Upon review, the Appeals Council vacated the June 25, 2002 hearing decision and

remanded the case with the following instructions, to wit:

---

[4]*See* Decision of ALJ Dadabo dated June 25, 2002 [Adm. Rec. 374-381].

[5]At the comparison point, Taylor's affect was inappropriate, his judgment and insight
were nil, his thought content was very grandiose with persecutory and religious delusions and he
suffered from visual/auditory hallucinations. Prescription drug therapy for his condition included
neuroleptic medications, Haldol and Akineton. *See* Charity Hospital Records  [Adm. Rec. 238-
257].

2

[T]he Appeals Council vacates the hearing decision and remands this case to an Administrative Law Judge for resolution of the following issue:

The record contains inconsistencies regarding the claimant's mental impairment. See Exhibit B30 and B43. On September 9, 2000, Dr. Alvin Cohen was of the opinion that there did not appear to be an indication for psychiatric therapy at the time and there was no clinical evidence of psychosis. On May 21, 2002, J. Stephen York, Ph.D was of the opinion that other secondary sources should be reviewed to determine the claimant's level of functioning. It was determined that the claimant was in need of psychiatric services to address his grandiose, persecutory ideas and delusional thought patterns, even though he may be significantly malingering about them. The Appeals Council finds that additional development is needed to assess the claimant's mental impairment and to determine if in fact medical improvement has occurred.

Upon remand, the Administrative Judge will:

Obtain any additional evidence necessary to complete the administrative record and give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of the assessed limitations.... In so doing, contact third party sources for more information to determine if the claimant is truly schizophrenic or if he is malingering. In addition, contact the claimant's treating physician for medical records and treatment notes. As appropriate, the Administrative Law Judge may request the treating source to provide clarification of any opinion and medical source statements about what the claimant can still do despite the impairments.

***

Obtain evidence from a medical expert to clarify whether the claimant's impairments meet or equal the severity of an impairment listed in Appendix 1, Subpart P, Regulations No. 4 ....[6]

On April 19, 2004, pursuant to a second administrative hearing, ALJ Charles Kunderer issued a thirty-two page decision finding that (1) Taylor had experienced medical improvement since the initial disability determination, (2) plaintiff's "medical improvement" was related to capacity for work and (3) his disability ceased on October 1, 2000.[7]

---

[6]*See* Order of Appeals Council dated January 2, 2003 [Adm. Rec. 549-551].

[7]*See* Decision of ALJ Charles W. Kunderer dated April 19, 2004 [Adm. Rec. 335-366].

3

The ALJ thoroughly discussed the medical evidence of record, complied with the Appeals Council's instructions with respect to further development of the record and making a determination as to whether Taylor is truly schizophrenic or if he is malingering.  ALJ Kunderer noted that the basic issue to be determined is whether Taylor is disabled within the meaning of the Social Security Act and highlighted the standard of review applicable to this termination of disability benefits case, *i.e.*, whether medical improvement occurred.[8]

### B. Medical History of the Plaintiff

Plaintiff does not dispute the ALJ's summary of the medical evidence which comprises the administrative record.  The highlights of the ALJ's thorough analysis are reiterated below beginning with Taylor's testimony regarding the degree of his pain and functional limitations which were not credited, to wit:

> Mr. Taylor testified that he was forty-four years of age and had a sixth grade education.  He further took a course in welding, however, never worked as a welder.  Mr. Taylor had past relevant work as a security guard and a baker.

> Mr. Taylor stated he was suffering from paranoid schizophrenia, major depression, learning disorder, severe lumbar pain with radiation down into his lower extremities and weakness throughout his dominant left upper extremity.

> Mr. Taylor had low self-esteem as people called him crazy.  He was paranoid that others in the neighborhood were out to get him.  Mr. Taylor had been waiting on Desire Florida Mental Health Center to call him back with an appointment date but they never got back in touch with him.

> Mr. Taylor stated that he had been in special education throughout his entire academic life.  He had difficulty reading and writing and could not read well.  Mr. Taylor state that he genuinely did his best when he was evaluated by psychologist York.

---

[8] *See* ALJ Kunderer's Decision at p. 6 of 32 (citing Sections 223(f) and 1614(a)(5) of the Social Security Act) [Adm. Rec. 340].

Mr. Taylor was in severe lumbar spine pain. The pain awakened him up out of his sleep. Surgery was being discussed on his spine. The most he could lift/carry was five pounds, sit twenty to thirty minutes and stand on-half hour to forty-five minutes at a time. Mr. Taylor had to lie down in bed because of his requiring heat on his spine. Mr. Taylor could not write because [of] hand surgery for carpal tunnel syndrome.

Mr. Taylor was attending the Medical Center of Louisiana at New Orleans orthopedic clinic and physical therapy. Mr. Taylor consumed Mylanta, Prilosec, Amitryptaline and Vioxx.

At the time that claimant was found disabled he was suffering from paranoid schizophrenic reaction which met the criteria of 12.03 A 4, 7 & B. Such determination was made based upon Mr. Taylor's hospitalization of December, 1983 and a psychiatrist evaluation by Dr. Charles C. Ramsey dated April 2, 1984.[9]

The ALJ's summary of the plaintiff's treatment at Charity hospital and Dr. Ramsey's

treatment/diagnosis of Taylor is substantially correct, to wit:

Mr. Taylor was hospitalized at Charity Hospital from December 7, 1983 through December 19, 1983. Mr. Taylor was diagnosed with chronic paranoid schizophrenia and rule out toxic psychosis. Mr. Taylor was cooperation with the evaluation and sustained interest in the evaluation. He maintained good eye contact. Mr. Taylor's speech was clear and articulate without pressure or stuttering. Mr. Taylor was calm without tremors or mannerisms. Mr. Taylor's thought form consisted of many loose associations with tangential thought processes. His thought content was very grandiose with persecutory and religious delusions. Mr. Taylor believed that his former employer whom he was suing was out to get him. He further believed that he was the righteous one chosen by God to rid the world of all the unrighteous people. He was not homicidal or suicidal but [had a] history of threatening [his] family. Mr. Taylor's affect was inappropriate and was fluctuating with differences in speech. Mr. Taylor had visual and auditory hallucinations. Memory could not be assessed. Mr. Taylor's judgment and insight were nil. Mr. Taylor's physical examination was basically unremarkable except for positive wasting of the left thenar eminence with weakness of the hand to grasp and left wrist flexion. Mr. Taylor was administered Haldol and Akineton. EEG was unremarkable. Toxicology screen was negative for PCP. Urinalysis was unremarkable. Mr. Taylor admitted to smoking Cannabis once to twice a day. (Exhibit B-24).

---

[9]ALJ Kunderer's Decision at p. 6 of 32 [Adm. Rec. 340].

Mr. Taylor was evaluated on April 2, 1984 by psychiatrist Ramsey. Mr. Taylor had ridden the Public Service bus to psychiatrist Ramsey's office and was unaccompanied to the evaluation. He had impeccable hygiene and was well dressed.

Mr. Taylor appeared quite paranoid and psychiatrist Ramsey had some questions as to the validity of the history he provided. Mr. Taylor informed psychiatrist Ramsey that he had a current suit pending against his employer for sustaining injury to his left upper extremity. He was engaged in family conflicts over his not working and family members insisting on his working or stealing to bring money into the household with their eventually having him institutionalized in December, 1983. Following his release from Charity Hospital he attended Desire Florida Mental Health Center once, but stated that psychiatrists would not prescribe him his medications. Psychiatrist Ramsey [had] seen that while [Taylor] was in the hospital he was administered Haldol, however, Mr. Taylor felt that Haldol did something to his body – paralyzed him. On presentation, Mr. Taylor had a container of Navane, but psychiatrist Ramsey had some question as to whether he was taking the medication because he still had many pills left in the container and had not seen anyone, as far as he could determine, since his hospitalization at Charity which was precipitated by an argument with his parents.

Mr. Taylor stated that he continued to feel "weak and paralyzed." He felt "like the living dead." Mr. Taylor denied use of drugs or alcohol prior to his condition, however, did own up to smoking Cannabis on occasion. He stated that he had not smoked Cannabis in over two weeks because he didn't have the money. Mr. Taylor denied being a heavy drinker, but stated that he had an occasional beer. Mr. Taylor said that he had few friends that he visited. He had a girlfriend but had to give her up.

Mr. Taylor initially denied hallucinations, however, as the interview progressed and such was repeatedly asked of him, he claimed that he had seen visions of dead people and heard them talking to him. He also heard people talking about him and telling him that they were going to harm him in some way, or were saying bad things about him. Apparently, such was continuing at the time.

Mental status examination revealed a pleasant, cooperative young man. Even though he was extremely paranoid, he was not particularly hostile and appeared somewhat depressed, however, he denied feelings of depression. Mr. Taylor denied having ever had suicidal thoughts.

Sensorium was intact in that he was fully oriented. Affect was appropriate. Mr. Taylor was extremely paranoid and blamed all of his difficulties on others. He did not appear to be extremely angry, however, Mr. Taylor endorsed auditory/visual

6

hallucinations and referential thinking. He was obviously delusional. Calculations were done quite well by Mr. Taylor and compatible with his education. Mr. Taylor had [an] excellent fund of information and intellect appeared to be well within the normal range. Mr. Taylor's judgment was difficult to determine and psychiatrist Ramsey had some question as to whether or not he may have used drugs. He denied the use of all drugs except Cannabis. Mr. Taylor did state that he would continue to smoke Cannabis if he had the funds to purchase it. Mr. Taylor appeared to have moderate restriction of interests and activities at the time due to paranoia.

Psychiatrist Ramsey's impression of Mr. Taylor's condition was paranoid schizophrenic reaction. (Exhibit B-26).[10]

More current medical evidence, upon which the ALJ determined that Taylor was no longer disabled, was also accurately summarized, as follows:

On September 26, 2000 psychologist Montz determined that Mr. Taylor had no severe emotional condition when evaluating his personality disorder. Psychologist Montz had noted that Mr. Taylor had no repeated episodes of decompensation..., marginal adjustment that with even minimal increase in mental demands or change in environment caused him to decompensate or inability to function outside a highly supportive living arrangement. (Exhibit B-10, pg. 13) Orthopedic surgeon Isaacson determined that Mr. Taylor was capable of performing medium [level] work activity with no climbing of ladders/ropes/scaffolds or working at heights. Orthopedic surgeon Isaacson found that Mr. Taylor's initial basis for disability of left hand carpal tunnel syndrome had resolved, however, he currently suffered with lumbar disc syndrome. (Exhibit B-10, pg. 5).[11]

*** 

Mr. Taylor was evaluated by psychiatrist Alvin Cohen on September 9, 2000. Mr. Taylor appeared for the appointment accompanied by his wife. It was noted that Mr. Taylor walked with a limp. Psychiatrist Cohen noted that Mr. Taylor related and communicated in a responsive and adequate manner.

Mr. Taylor was very vague in relating what transpired when he was hospitalized at Charity, however, he did recall that he was hallucinating and that the devil was coming after him and the devil was on a cross and the devil frightened him. Mr.

---

[10]ALJ Kunderer's Decision [Adm. Rec. 341-342]; *see also* Psychiatric Report of Charles C. Ramsey, M. D. dated April 2, 1984 [Adm. Rec. 260-262].

[11]*Id.* [Adm. Rec. 337].

Taylor stated that he was heavy into alcohol at the time.

Mr. Taylor voiced feelings of sadness occasionally, but stated that, in general, he was a pretty happy individual. He said that he did not usually get angry or upset but different people called him crazy and, when that happened, he [would lose] his ability to control anger and he lashed out. Mr. Taylor was not suicidal but had had thoughts of death. Life was empty for him. He did not sleep very well. Mr. Taylor's wife informed him that when he turned in his sleep, he jumped instead of just turning. He believed he jumped because of his pain. He had pains in his chest, hips and lower extremities. Mr. Taylor worried about whether he would have a happy day or not. He was always tired and said that his energy level was extremely low and it was hard for him to remember. Mr. Taylor was easily distracted. Mr. Taylor was overly dependent and did not want any responsibilities. Mr. Taylor was not hallucinating or delusional. Mr. Taylor had no major complaints other than pain.

Mr. Taylor appeared younger than his state age. He was appropriately groomed. He was cooperative attentive and spontaneous. His mood was pleasant. His affect was appropriate. Mr. Taylor's orientation was intact. There was not evidence of hallucinations. Mr. Taylor's thought processes were goal-directed. There was no blocking or looseness of associations. Mr. Taylor was not preoccupied with any obsessional beliefs. He was not delusional. Mr. Taylor was not suicidal or homicidal. Mr. Taylor's memory was adequate as was his intellect.

Psychiatrist Cohen found that Mr. Taylor had no marked restrictions in his capacity to perform the usual activities of daily living. His social functioning was not markedly restricted. There was no evidence of deterioration or decompensation in a work-like setting based on psychiatric findings. There was no evidence of psychosis at that time.

Psychiatrist Cohen diagnosed Mr. Taylor with substance induced mood disorder with psychotic features, by history, in remission by history; substance abuse, alcohol, by history, in remission by history and personality disorder, not otherwise specified. Mr. Taylor's prognosis was guarded. There did not appear to be any indication for psychiatric therapy at that time. Mr. Taylor was seemingly competent to manage his own funds and stated that he had been doing so. (Exhibit B-30)[12]

Mr. Taylor was evaluated by psychologist J. Steven York on May 21, 2002. Mr. Taylor arrived fifteen to twenty minutes earlier for the evaluation. He arrived via streetcar. Mr. Taylor was casually attired in a white and tan striped long-sleeved

---

[12]See Report of Pschiatrist Alvin Cohen dated September 9, 2000 [Adm. Rec. 275-277].

8

shirt and tan pants and was neat in appearance and grooming.  Mr. Taylor was walking with a crutch and had a noticeable limp.  Mr. Taylor was very tall with a slender build.  He appeared his stated age.

Mr. Taylor stated that he was very concerned over people killing him.  He said they could put bullets in him but they could not kill him because he was eternal. He said all the neighbors on his whole block were trying to kill him.  When asked about difficulties, Mr. Taylor said that he had been having pains from head down to his feet since 1991.  He was involved in a work-related accident , and said "That's how I got crazy."  Mr. Taylor then looked at the desk and said that he had a plate of food on the desk, holy food.

Mr. Taylor resided by himself, although such was not clear.  When asked with whom he lived with, Mr. Taylor said he lived with God my Jesus, my angels.  He also said that the devil was trying to enter his home.  Mr. Taylor was hospitalized two to three times a week.

Mr. Taylor entered the testing session willingly and was cooperative, but was very talkative.  He initiated much spontaneous conversation, primarily consisting of religious material.  For example, Mr. Taylor said he had to fight devils and said he was the third coming of Christ.  He persevered on such themes throughout the session.  Most responses to questions asked were related to the themes.  Mr. Taylor failed to appropriately elaborate on his past history.  In addition, he also gave inappropriate and/or incorrect answers.  Mr. Taylor's speech was adequately articulated and easy to comprehend.  Mr. Taylor had a simple but functional vocabulary.  Receptive language skills were grossly intact, as he comprehended most questions and task instructions.

Mr. Taylor did not maintain appropriate eye contact throughout the entire session. He exhibited a flat affect and sis not establish rapport with psychologist York. Mr. Taylor displayed gross motor coordination that appeared to be below normal limits, as he walked with a noticeable limp.  Mr. Taylor was calm and attentive throughout the session.  No tics, tremors or other unusual behaviors were noted.

Mr. Taylor was well oriented to person and place, but not time.  When asked about the time, he said "Only God knows, I'm dead anyway."  Mr. Taylor had auditory/visual hallucinations.  He stated that he saw the devil going into people's souls.  He heard the devil talking to people all day long.  Mr. Taylor also reported compulsions and obsessions.  His compulsions included praying all day and all night so he would walk outside and face "him."  His obsessions included "killing them devils."  Mr. Taylor's thoughts were not logical, but coherent.  Mr. Taylor's self-report was not appropriately detailed. He persevered about the devil and people trying to kill him, but did not give many details relating to his past history,

9

including family, employment, injuries, etc. Mr Taylor's memory for recent events was intact, but his memory for remote events was not intact. Insight into the nature of his problems was limited as Mr. Taylor was obsessed with his religious ideas such as the devil and others trying to kill him. Mr. Taylor acknowledged his physical pain. Mr. Taylor answered all judgment questions inappropriately. When asked about mood, Mr. Taylor reported that he felt "crazy" most of the time. Mr. Taylor reported feeling happy "when my God show them people that them bullets ain't killing me." Mr. Taylor felt sad when "my wife going to bed with all these men so they can kill me. I'm a cripple man. I don't have time for that." Mr. Taylor felt angry when he had to look at the same devils everyday. Mr. Taylor worried that he couldn't eat and that nobody wanted to feed him. Mr. Taylor was afraid of his God. He did not want the devil to beat him. He added, "I'm a cripple man, I can't work and can't walk."

Mr. Taylor answered general information questions inconsistently. When asked who was the current president, he said his wife "sent the president." He named "Moriel" as the former president. He named "Nicholas Montgomery" as the mayor of New Orleans. He said that the did not know the name of the governor of Louisiana, but said he was a wrestler. He knew the date, the month and the year. He was not sure if the day of the week was Tuesday or Thursday. Mr. Taylor knew his age and birthday, but added that he was born on the same day as Christ was born. He said 1959, but reported, "but I'm way back  2000 BC I'm the third coming of Christ." Mr. Taylor knew his telephone number, address, city and state. When asked to name the country, he replied, "God Bless America." Mr. Taylor incorrectly answered all simple math problems, including 1+ 1, which he said was 11. He knew which of two numbers was larger, but not smaller.

Based on the results of Mr. Taylor's mental status examination, and on his improbable responses to general information questions, he was administered the Peabody Picture Vocabulary Test to determine if he was not putting forth adequate effort for valid testing. Mr. Taylor missed nine items out of two samples and the first ten items administered. Initially, Mr. Taylor said "A, B, C, D, E, E, G" when asked to provide a number. Then he said four, and all remaining responses were four as well. Psychologist York believed that Mr. Taylor was not putting forth his best effort, and as a result further testing was not conducted, as the intellectual assessment would not be considered valid.

Psychologist York noted that during the current evaluation, Mr. Taylor was very talkative, primarily his thought content consisted of persecutory delusions (i.e., other are trying to kill him) and grandiose ideas (i.e., he is eternal and is the third coming of Christ). Mr. Taylor provided minimal responses when asked about his history, and was an unreliable historian. Throughout the session, Mr. Taylor's eye contact was poor, affect flat, and he appeared unmotivated.

The results of [the] present evaluation indicated that Mr. Taylor's broad cognitive functioning could not be determined because his responses to the mental status examination and screening with the Peabody Picture Vocabulary Test suggested that he was not putting forth adequate effort. Mr. Taylor was not able to respond correctly to basic information questions that young children know, responding incorrectly to even the most basic math problems. He was unable to provide appropriate answers to basic vocabulary items that most two year olds could accomplish. Psychologist York felt that Mr. Taylor could function at much higher levels; and, therefore, additional testing was not completed, since the results would have been considered invalid. It was not recommended that Mr. Taylor return for disability assessment until he was motivated to produce valid results. Psychologist York felt that Mr. Taylor was in need of psychiatric services to address his grandiose, persecutory ideas, and delusional thought patterns; **however, it was felt that Mr. Taylor may have been *significantly malingering* about them also**. (Exhibit B-43)[13]

Records upon which it was determined that Mr. Taylor was not disabled in connection with his applications for a Period of Disability, Disability Insurance Benefits and Supplemental Security Income filed on July 2, 2002 consists of those from the Medical Center of Louisiana at New Orleans, orthopedist Donald C. Faust, and psychologist Thomas Welsh.

Mr. Taylor was examined by orthopedist Donald C. Faust on September 3, 2002. Mr. Taylor complained of lumbar spine pain. He stated that the could walk one or two blocks. He did not require use of a cane, crutch or brace. Mr. Taylor was six feet tall and weighed one hundred twenty-seven pounds. He moved about quite well on the examining table getting up from the chair. He could literally bend forty degrees, internally rotated twenty degrees, and abducted his hips to forty degrees. Faber's test hurt bilaterally. Mr. Taylor could make a full fist. The elbows were extended fully and flexed to one hundred-fifty degrees. The shoulders abducted to one hundred-seventy degrees, externally rotate eighty degrees and internally rotate eighty degrees. The wrists pronate ninety degrees, supinate ninety degrees, extend sixty degrees, and flex eighty degrees. Mr. Taylor had good grip strength bilaterally. The sublime of the ring and little fingers were working. He had absent sublime of the index and long finger. Allen's test was negative in the hand. Grip strength dynamometer readings on the left measured, 20, 30, 20, 35 and 15 pounds of force in the first through fifth positions. The right measured 55, 80, 85, 75, and 70 pounds of force. He was diffusely tender in the arms. It was noted that Mr. Taylor had heavy calluses on both hands and feet. No ulcers on the feet. Mr. Taylor was diffusely tender throughout his lumbar spine.

---

[13]*See* Dr. Steven York's Report of Psychological Assessment dated September 21, 2002 [Adm. Rec. 320-324].

11

Straight leg raising was negative.  Neurological examination of upper and lower extremities was unremarkable.

It was the opinion of orthopedist Faust that Mr. Taylor suffered a laceration as an adolescent to the left upper extremity. He had apparent full use of the left upper extremity with possible loss of sublimis function which was not felt to impact his activities.  Mr. Taylor complained on spinal pain and lower extremity pain without any neurological findings.  Mr. Taylor had no evidence of a mental condition.  Orthopedist Faust placed no restrictions on Mr. Taylor's functioning. Mr. Taylor appeared active and independent and able to care for himself.  (Exhibit 3F)[14]

Mr. Taylor was evaluated by psychologist Thomas M. Welsh on March 4, 2004. Mr. Taylor was brought to the session by taxi-cab.  He had no difficulty getting to places using public transit or taxi-cabs.  Mr. [Taylor] was the sole informant and was considered to be a fair informant.

Mr. Taylor was a casually dressed young man who appeared his stated age.  There was no evidence of compulsions or rituals during the session.  No unusual motor behavior was observed.  Rapport during the interview was good.  Eye contact was well established.  There was no indication of unilateral neglect.  Mr. Taylor appeared motivated; he was cooperative with the psychologist.  He worked a sufficient [amount] of time on all questions, suggestive of adequate motivation. Affect was variable-happy and interested.

When asked regarding activities of daily living, Mr. Taylor stated "lay around and watch TV."  He was independent in caring for his personal hygiene, grooming and dressing.  He could choose the correct restroom in public places.  He changes his dirty clothes without reminders.  He could cook macaroni and eggs.  He could serve himself at the dinner table and could order food in public places.  Mr. Taylor did all of his own shopping and had no difficulty returning home with correct change.  Mr. Taylor knew the number of pennies in a nickel, the number of nickels in a quarter and the number of quarters in a dollar.  Mr. Taylor reported no difficulty in using the telephone, but he did not look up telephone numbers in the white pages.  Mr. Taylor stated that he cashed all of his own checks.

Mr. Taylor was able to follow simple commands.  Voice was of adequate volume. Vocabulary was adequate for communication during the session.  Speech was goal-directed; there was no evidence of a thought disorder of form.  Psychologist Welsh had no difficulty comprehending what Mr. Taylor said.  Mr. Taylor was

---

[14]*See* Report of Orthopedic Surgeon Dr. Donald Faust dated September 3, 2002 [Adm. Rec. 453-455].

alert and oriented in four spheres. He knew the month, day and year of his birth. He stated his address when asked. Mr. Taylor could repeat nine digits forward and three digits backwards. Mr. Taylor was not distracted by extraneous noises in the hall and did not have difficulty keeping his hands off the test materials. Mr. Taylor repeated four nouns on the first trial. He recalled three out of four concrete nouns after five minutes. Mr. Taylor was not suicidal or homicidal. Mr. Taylor denied delusions, hallucinations or paranoia. Mr. Taylor had few friends and did not trust others. Friends did not come by his house to visit, just his brother from Baton Rouge. Mr. Taylor's fund of general information was poor. He did not know the current president, the vice president or the governor. He did not know that Lincoln was president during the Civil War. Reasoning of similarities was concrete. He did not give any interpretation for proverbs the psychologist asked. Mr. Taylor was able to do simple subtraction and addition of integers.

On assessing Mr. Taylor's adaptive/cognitive functioning, Mr. Taylor stated that the looked in both directions and waited for traffic to clear before crossing the street. He could disinfect and bandage a cut. He could use a thermometer to find out if he had fever. He denied any difficulty with memory. Mr. Taylor did not lose things around the house and had no trouble finding familiar places. Sustained attention and persistence was adequate to watch a movie for two hours. Language and communication were adequate for testing. He had no difficulty writing. Mr. Taylor's language abilities were adequate for most jobs. His rate of responding would not cause any concern in social interactions.

On administration of the Wechsler Adult Intelligence Scale-Third Edition, Mr. Taylor was performing in the significantly below average range on Performance and Verbal Intelligence. The Full Scale I.Q. was interpretable. The Full Scale I.Q. was in the mild mental retardation range. Mr. Taylor appeared to pay adequate attention to each item, and his responses were not produced too quickly. Mr. Taylor did not receive any bonus points due to response speech on any performance items. However, he did tend to increase time on task as item difficulty increased. Examination responses from Picture Completion showed that Mr. Taylor could name common objects. Fine motor skills did not impair performance. There was no evidence that he was missing items on purpose; he tended to get the early items of a subtest correct, and as difficulty increased, errors increased.

Psychologist Welsh noted that Mr. Taylor's scores may overestimate his verbal intelligence because he scored average range on one subtest that measured his ability to recall numbers from memory. Mr. Taylor's actual I.Q. was probably in the low mild range of mental retardation. (low 60's)

Results of the Minnesota Multiphasic Inventory-II were valid. There were several

13

scales that were elevated, especially scale II (depression). It indicated that Mr.
Taylor suffered from depression with demoralization, cynical attitudes and low
self-esteem as well as social avoidance.

In summary, Mr. Taylor presented with depression and lumbar spine pain. He
walked with a cane and seemed to favor his right lower extremity. He stated that
he had daily depression for the past three years which is ever since he lost his
Social Security benefits and had his electricity turned off in his apartment. Mr.
Taylor's depression was manifested by sadness, fatigue, lack of energy or pep,
loss of interest in things that use to interest him, poor appetite, sleep disturbance,
forgetfulness and headaches. The MMPI-II indicated depression with
demoralization, cynical attitudes, low self-esteem, as well as shyness and social
avoidance. Medical records confirmed his suffering from lumbar spine pain. Mr.
Taylor functioned cognitively significantly below average range. Mr. Taylor
stated that he would be able to manage his funds as he was his own designate
payee when he received disability benefits in the past. Mr. Taylor's prognosis was
fair in that with mental health care his depressive symptoms should remit.

Psychologist Welsh diagnosed dysthymic disorder, rule out major depressive
episode, rule out dependent personality and back injury. (Exhibit 8F)[15]

### C. Administrative Hearing

Plaintiff testified at the hearing that he was then forty-four years old and completed the

sixth grade at age fifteen. He held jobs in the past for short periods of time as a dishwasher and

he performed some security work. Taylor worked less than six months at each job; each work

period ended with the plaintiff injuring himself. He sued his first employer and also filed claims

for worker's compensation with respect to his two positions in the security field.[16]

Taylor testified that he could only sit for about 30 minutes and stand for about 45 minutes

without feeling severe pain radiating down both legs. As to his daily activities, plaintiff testified

---

[15]ALJ Kunderer's Decision at pp. 9-13 of 32 (summarizing medical history of claimant)
[Adm. Rec. 343-347]; *see also* Post-Hearing Psychological Report of Dr. Thomas M. Welsh
dated March 1, 2004 [Adm. Rec. 520-526].

[16]*See* Transcript of Oral Hearing dated January 13, 2004 [Adm. Rec. 593-594].

14

that he wakes up at various times in the morning and then just watches TV.[17]  Taylor further

testified that he takes Mylanta to settle his stomach, Vioxx for pain and Prilosec.[18]  Turning to his

ability to read and write, plaintiff stated that he can read some easy words and he is capable of

writing a short note.[19]  At the outset of the hearing, counsel for the plaintiff characterized Taylor

as  "a man with a very limited education who has trouble reading and writing," but is not "an

illiterate."[20]   However, at the close of the hearing, plaintiff testified that he had just recently

gotten a driver's license.   Taylor stated that he had to study hard to pass the test and that his

license is valid for five years.[21]  Plaintiff further admitted that he took the written test by himself

(without anyone reading the test to him).[22]

When asked about his behavior during the consult with Dr. York, Taylor denied "faking

it" or  trying to "make [him]self look stupid."[23]  However, as far as answering the question posed

by counsel during the hearing – *i.e.*, whether he put forth his best effort during the examination

by Dr. York – Taylor artfully dodged the questions by stating that "[w]e was getting along real

good until I had to use the bathroom and she was telling be about these blocks."[24]

_____

[17]*See* Transcript of Oral Hearing dated January 13, 2004 [Adm. Rec. 594].

[18]*Id.* [Adm. Rec. 595].

[19]*Id.*

[20]*Id.* [Adm. Rec. 592].

[21]*Id.* [Adm. Rec. 606-607].

[22]*Id.* [Adm. Rec. 607].

[23]*Id.* [Adm. Rec. 597].

[24]*Id.*

Addressing his back condition (lumbago), Taylor testified that he attends Charity's orthopedic clinic and that he had an appointment scheduled for January 30, 2004 to discuss whether they will just continue his medication and physical therapy or perform surgery.[25] When questioned about his back pain, plaintiff testified that "it feel[s] like my disc is pressing up against my back, a nerve or something."[26]  Taylor stated that, after walking about a block and a half or climbing stairs, the pain pounds in his leg.[27]  Plaintiff testified that, if he lifts anything over ten pounds, his back "shoots pain straight down [his] legs."[28]  When asked about how many hours during the daytime that he lies down, plaintiff responded that, if he did not have to get up and go to the door sometimes, he would lie down all day long.  Plaintiff explained that he has an electric blanket and he needs to apply the heat to his back.

Plaintiff verified that, other his treatment at Charity in 1982-1983, he had no psychiatric treatment at all during the 1990's up to the present.[29]  Plaintiff explained the complete absence of any psychiatric treatment for a period of approximately two decades by stating that he went to the clinic three times, was given "the run around" and they [the clinic]  never notified him of an appointment by mail.[30]

---

[25]*Id.* [Adm. Rec. 596].

[26]*Id.* [Adm. Rec. 598].

[27]*Id.* [Adm. Rec. 597-598]

[28]*Id.* [Adm. Rec. 598].

[29]*Id.* [Adm. Rec. 599].

[30]*Id.* [Adm. Rec. 600].

Medical expert psychologist, Dr. Carlos Kronberger, was present throughout the administrative hearing and testified that it was entirely possible that, when Taylor was first given the diagnosis of and treated for paranoid schizophrenia, he had actually experienced a drug induced toxic psychosis. Dr. Kronberger highlighted the fact that the medical records showed that plaintiff admitted using cannabis. In other words, Dr. Kronberger questioned the correctness of mental condition diagnosed in 1983-1984 (paranoid schizophrenia), particularly considering that the condition completely resolved or remitted without any appreciable prescription drug treatment or psychotherapy and that the psychotic condition has remained in remission for decades. Most notably, when plaintiff discontinued using marijuana and alcohol, the mental condition completely subsided.[31]

As to the inconsistency between the opinions of Drs. York and Cohen, Dr. Kronberger agreed with the Appeals Council's assessment that there appears to be *some* inconsistency between their opinions. Addressing Dr. York's opinion, which suggested that Taylor might have delusions or hallucinations, Dr. Kronberger opined that "that would be very inconsistent with somebody not receiving any treatment for that length of time."[32] He further noted that Dr. York was not totally able to rule out the presence of psychosis and that is a major discrepancy, but that it is clear that Dr. Cohen does not believe that Mr. Taylor has any intellectual limitations or any significant limitations which would preclude the kind of work Taylor did and might have been

---

[31]*See* Transcript of January 13, 2004 Administrative Hearing [Adm. Rec. 600-602]. *See also* Transcript of April 24, 2002 Administrative Hearing (wherein plaintiff testified that he no longer does any kind of drugs or alcohol and has not even had a beer within the last eight years) [Adm. Rec. 572].

[32]*See* Transcript of January 13, 2004 Administrative Hearing [Adm. Rec. 601].

doing for years.[33]

The ALJ assigned great weight to psychiatrist Dr. Cohen'opinions and conclusions, which were consistent with that of the medical advisor, Dr. Kronberger.  The plaintiff's history of cannabis dependence and alcohol abuse were noted in addition to Taylor's admission that such drug/alcohol abuse coincided with the peak period of paranoia and auditory/visual hallucinations. ALJ Kunderer specifically noted that Dr. York, who evaluated Taylor on May 21, 2002, determined that plaintiff was malingering during his evaluation and that Dr. York's suspicion of malingering on plaintiff's part  was confirmed by Taylor's performance on the Peabody Picture Vocabulary Test.

### D. ALJ's Findings

ALJ Kunderer concluded that the catalyst for Mr. Taylor's alleged disabling conditions is his desire to retain Social Security benefits.  The ALJ determined that the plaintiff was truly obsessed with regaining his Social Security benefits and, with that end in mind, he "feigned his cognitive functioning and severe pain" for the purpose of "severely erod[ing] his work capacity to that of no work."[34]  The ALJ observed that the plaintiff attempted to persuade Psychologist York of his complete "disability" by stating, "'I'm a cripple man, I can't work and can't walk.'"[35] The ALJ also noted that Psychologist York felt that it was significant that Mr. Taylor had established a pattern of work related injuries and reporting that every time he gets a new job he

---

[33]*Id.* [Adm. Rec. 602].

[34]*See* ALJ Kunderer's Decision at p. 26 of 32 [Adm. Rec. 360].

[35]*Id.*

18

has to sue his employer.[36]  It was further noted that on June 28, 2000, pursuant to the Notice of

Continuing Disability Review, Taylor's interview focused on carpal tunnel syndrome and lumbar

spine pain and there was no mention of mental condition being an integral part of his disabling

conditions.[37]  The ALJ highlighted that it only after it was determined that his disability status

ceased on Reconsideration that Taylor focused on a mental condition in addition to his lumbago.

The ALJ painstakingly documented all of the instances which support his conclusion that

the plaintiff was malingering and not credible insofar as he alleged disabling cognitive and

physical limitations which precluded gainful employment at any level of exertion.  ALJ Kunderer

explained:

> I have taken Administrative Notice of the following instances:
>
> The disability examiner noted that Mr. Taylor limped when he entered her office.
> When asked if he had any difficulty sitting he began shifting his weight in the
> chair (he had sat perfectly still until that time).  The disability examiner noted that
> Mr. Taylor did not limp when he left her office.  (Exhibit B-21)  Administrative
> Notice is taken that the claims representative who assisted him in completing his
> Reconsideration Disability Report on June 18, 1983 noted that Mr. Taylor held his
> pen somewhat strangely - as if he didn't have a grip on it - however,  [he] signed
> his name extremely legibly.  (Exhibit 13)
>
> Administrative Notice is taken that during his hospitalization at Charity in
> December 1983, Mr. Taylor was faking a side effect of neuroleptics.  He was
> holding his head on the left shoulder but upon request could rest it on the right
> shoulder or hold his head in a normal position. (specifically, Exhibit B-24, pg. 13)
>
> When asked initially by psychiatrist Ramsey if he had any delusions or
> hallucinations, Mr. Taylor denied [that he had] any.  However, as the interview
> progressed and psychiatrist Ramsey repeatedly asked over and over again about
> his having delusions or hallucinations, Mr. Taylor admitted that he saw visions of
> dead people and heard them talking to him.  He further heard people talking about

---

[36]See id. (referring to Psychologist York quoting the plaintiff) [Adm. Rec. 354].

[37]See id. (citing Exhibit B).

him and telling him that they were going to harm him in some way, or were saying bad things about him.  Administrative Notice is taken that Mr. Taylor was not spontaneous in initially answering psychiatrist Ramsey's question regarding his having delusions and hallucinations and even denied them but as the session progressed he was able to compose in his mind what his conception of a psychiatric condition was (from the movie Sixth Sense) and relate such to psychiatrist Ramsey in a convincing way.  (Exhibit B-26).

On November 8, 2002, on of Mr. Taylor's physical therapists had seen him on the streets.  Mr. Taylor was using a crutch without using the assistance of the crutch and without any gait deviations. (specifically, Exhibit 5F-11)

Mr. Taylor complained of severe pain throughout his lumbar spine with radiation down into his lower extremities bilaterally.  Mr. Taylor was insistent that he had a severe spinal condition and that the orthopedists had only to see his MRI of November 27, 2000 to that he was in genuine pain.  On February 13, 2003 a faxed copy of Mr. Taylor's MRI was received by his orthopedist.  The MRI of November 27, 2000 revealed disc dehydration at L4-5.  He had a mild bulging disc – a small far lateral disc herniation could not be excluded and combination of such and hypertrophic spurring produced moderate stenosis of the L4 neural foramina bilaterally and a mild degree of spinal stenosis.  He had disc dehydration at L5-S1 without disc abnormalities and mild neural foraminal stenosis.  Only minor degenerative changes were seen at higher levels.  Orthopedists at the Medical Center of Louisiana at New Orleans did not think that the MRI correlated with Mr. Taylor's signs and symptom's at that time.  Physical therapy was ceased.  Mr. Taylor was discharged from orthopedics and referred to the spinal clinic. (Exhibit 5F-6)

On February 18, 2003, Mr. Taylor presented to the emergency room of Charity Hospital for lumbar spine pain.  Examination was unremarkable.  It was noted that Mr. Taylor ambulated well, however, used a cane and crutches.  (Exhibit 5F-4)

It appears as if Mr. Taylor may be engaging in heavy manual work activity.  It was noted by orthopedist Faust that when he examined Mr. Taylor on September 3, 2002 he had heavy calluses on both his hands and feet.  (Exhibit 3F)

When evaluated by psychologist Welsh on March 4, 2004 and [] asked what [the sum of] 1 + 1 was, [Taylor] stated 11.  I further note than when evaluated by psychiatrist Ramsey calculations were done quite well.[38]  Mr. Taylor sustained no

---

[38]See Opinion of Psychiatrist Charles Ramsey dated April 5, 1984 (noting that Taylor "appears to be well within the normal range intellectually" and that "[c]alculations are done quite well and compatible with his education level [eleventh grade]") [Adm. Rec. 261-262].

closed head injury or cerebral infarct to account for such deterioration in cognitive functioning. Mr. Taylor had managed his own Social Security funds and he had no designated representative payee. (Exhibits B-26 & 8F).

Mr. Taylor does not suffer from constant severe incapacitating pain.

Mr. Taylor was examined by Physical Medicine and Rehabilitation Specialist Camalyn Gaines on October 5, 2000. Mr. Taylor stated that he had been suffering from lumbar spine pain with radiculopathy since 1991. (Administrative Notice is taken that [he] first recieved care in January 2000....). The pain was most severe in his lumbar spine and lower extremities bilaterally....The pain was relieved with pain medication....

Longitudinal review of [the] record prior to Mr. Taylor's examination by Physical Medicine Rehabilitation Specialist Gaines indicates that Mr. Taylor was seen only for complaints of pain on January 1, 2000 and January 2, 2000. X-rays were unremarkable and he was not given a follow-up appointment with the hospital but instructed to attend Daughters of Charity (emergency room). Mr. Taylor received no epidural injections or physical therapy for his pain, only Motrin. (Exhibit B-31)

Regarding his activities of daily living, Mr. Taylor was independent in caring for his personal hygiene, dressing and grooming. Mr. Taylor assisted his wife in cooking dinner, washing dishes and sweeping. Mr. Taylor enjoyed playing sports on his play station as he could not physically participate in sports. Mr. Taylor walked to his sister's house that lived six blocks away from him and visited her daily. Mr. Taylor attended church faithfully on Sundays. Mr. Taylor used public transportation.

\* \* \*

Mr. Taylor was next examined by orthopedics in September 2002 – thirty-two months since last expressing any concern over severe lumbar spine pain. Mr. Taylor presented spine pine and radiculopathy. Range of motion throughout the spine was full and neurological examination was intact. Mr. Taylor denied urinary or fecal incontinence. Mr. Taylor stated that the pain was constant and relieved with Chlorzoxazone and Ultram. Mr. Taylor was to return to clinic in three months and pain management was recommended. (Exhibit 5F-15) EMG/NCV was unremarkable. (Exhibit B022-10) Mr. Taylor was next seen in clinic on January 14, 2003 at which time he complained of advancing lumbar pain and was walking with a cane. The cane had not been medically prescribed and on neurological examination he had 5/5 strength. Mr. Taylor was to return to clinic in July, 2003. (Exhibit 5F-9/Adm. Rec. 472).... When seen in orthopedics in July, 2003, Mr. Taylor continued to complain of pain. His examination remained unchanged from that in February, 2003. Impression was probable central

21

/foraminal stenosis.  No further orthopedic appointments were made for Mr.
Taylor; however, spine clinic appointments were made.  Bextra in addition to
Elavil was prescribed. (Exhibit 7F-4)

An MRI of the lumbar spine performed July 5, 2003 revealed *mild* concentric
bulging of the L4-5 intervertebral disc maximal in the left neural foramen with
possible foraminal stenosis.  There were *minimal* hypertrophic degenerative
arthritic changes at the margins of L3-4 and L4-5 apophyseal joints.  CT
myleogram was recommended.  Mr. Taylor was to return to clinic in September,
2003. (Exhibit 7F-3)

* * *

Mr. Taylor has not permitted pain to become the predominant focus in his life and
[it] has not been of sufficient severity as to warrant frequent use of [the]
healthcare system or significant use of narcotic pain medications.  His pain has
not caused any significant impact on his social life or occupational functioning.
Mr. Taylor's pain has not lead to inactivity or social isolation.

There is no diagnostic objective or clinical evidence of record to justify Mr.
Taylor's severely restricted work related activities.  Mr. Taylor maintains full
range of motion throughout his lumbar spine and although he has some evidence
of slight nerve root impingement it is so slight that it does not manifest itself on
clinical examination.  Mr. Taylor's lying down all day on a heating pad as well as
his use of a cane and crutch are not medically prescribed.

Administrative Notice is taken that in the Pre-Hearing Order dated March 5, 2003
I requested of Mr. Greenbaum to update all medical records.  It is noted that Mr.
Taylor had a return appointment with the orthopedic clinic in September, 2003
and Mr. Taylor had acknowledged to the disability examiner that he had been seen
by orthopedist Marrero and neurologist Hightower ....  Mr. Taylor's hearing was
not held until January, 2004.  Mr. Greenbaum had four months in which to submit
orthopedic records and nine months to submit records from hospitalizations at
Charity, from orthopedist Marrero and from neurologist Hightower.  At the
conclusion of the hearing, Mr. Greenbaum did not request that the record be held
open for receipt of updated medicals from the Medical Center of Louisiana at
New Orleans.  Mr. Greenbaum had requested that I order a full psychological
evaluation which I did and have assigned weight accordingly.

***

Mr. Taylor does not suffer from severe depression but dysthymia.  Mr. Taylor
exhibits absent or minimal symptoms (anxiety over termination of Social Security
benefits), good functioning in all areas, interested and involved in a wide range of
activities, socially effective, generally satisfied with life, no more than everyday
problems or concerns.  I find it implausible that Mr. Taylor would not have
personally telephoned or gone down to Desire-Florida Mental Health Center to

inquire as to the delay in his acquiring an appointment with them as Mr. Taylor was so instrumental in having Mercy Baptist Hospital fax over a copy of their MRI to the Medical Center of Louisiana at New Orleans. He was very persistent in both telephoning and finally presenting at Mercy Baptist to acquire the MRI. Mr. Taylor does not have any disorder of the thought processes and is well aware that he qualifies for mental health care through a state funded facility free of cost and would have certainly attended the center had he been experiencing any severe depression or psychosis.

Mr. Taylor's testimony that he cannot read is internally inconsistent with his admission that he recently acquired a Louisiana driver's license and that he took the written version of the rules of the road test. He stated that he had to study "hard" for two weeks in preparation to his taking the test.[39]

The ALJ assigned some weight to the opinions and conclusions of Psychologist Thomas Welsh, noting that he concurred in his March 4, 2004 assessment that Taylor does suffer from dysthymia, which is situational. The ALJ determined that the situation causing plaintiff's unhappiness was the prospect of having his benefits terminated. However, the ALJ disagreed with Welsh's assessment of the plaintiff's mental functioning and explained that "Psychologist Welsh did not factor in Mr. Taylor's exceptional adaptive functioning."[40] The ALJ further noted that MMPI-II is projective in nature and not individual specific and concluded, based upon the record in its entirety, that Taylor's assertions of depression, sadness, fatigue, shyness and social avoidance "are assertions that are goal directed at his acquiring a mental health condition and are without independent corroboration."[41]

Addressing the plaintiff's residual functional capacity to work, the ALJ made the following observations and findings, to wit:

---

[39]*See* ALJ Kunderer's Decision [Adm. Rec. 354-358].

[40]*Id.* [Adm. Rec. 361].

[41]*Id.*

23